FILED
2011 Jan-14  PM 03:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN  DIVISION

| | | |
|---|---|---|
| **MAVERICK ENTERPRISES, LLC, an** | ] | |
| **Alabama Limited Liability Company;** | ] | |
| **and KENNETH CARTER, an individual** | ] | |
| | ] | |
| **Plaintiffs,** | ] | |
| | ] | **CV-09-BE-1084-S** |
| **v.** | ] | |
| | ] | |
| **THE CITY OF ALABASTER, a** | ] | |
| **Municipal corporation, and DAVID** | ] | |
| **FRINGS, and JERRY WORKMAN,** | ] | |
| **individuals,** | ] | |
| | ] | |
| **Defendants.** | ] | |
| | ] | |

## MEMORANDUM OPINION

This matter is before the court on the City of Alabaster's "Motion for Summary Judgment" (doc. 47) and "Motion to Strike" (doc. 52).  Plaintiffs, Maverick Enterprises, LLC and that company's only member[1], Kenneth Carter, bring this suit alleging that the City of Alabaster's actions regarding their real property violated their right to Equal Protection under the Constitution of the United States.  For the reasons stated in this Memorandum Opinion, the court finds that the motion to strike is due to be DENIED and the motion for summary judgment is due to be GRANTED.

---

[1] The Amended Complaint does not specifically state Carter's position at Maverick, but his affidavit, filed as evidence opposing summary judgment, states that he is Maverick's only member and its forming member.

1

## I.  PROCEDURAL BACKGROUND

On June 1, 2009, Plaintiffs filed this suit against the following Defendants: the City of Alabaster, Mayor David Frings, and Jerry Workman, a member of the Alabaster City Council. After Defendants filed a motion to dismiss (doc. 6), Plaintiffs amended the complaint to bring four counts against these Defendants alleging violations of substantive and procedural due process, equal protection, and civil rights (doc. 14).  Plaintiffs subsequently filed a stipulation of dismissal asking the court to dismiss Defendant Workman with prejudice (doc. 21), and the court did so (doc. 22).

Defendants filed a motion to dismiss (doc. 12), which the court granted in part and denied in part (doc. 23), dismissing with prejudice Frings as a party Defendant and dismissing with prejudice all claims *except* the claim in Count Three.  Count Three alleges that the City of Alabaster violated Plaintiffs' constitutional right of equal protection.  Plaintiffs filed a motion to alter, vacate, or amend its order (doc.  25), attaching a Second Amended Complaint.  The court denied the motion to alter or vacate, and refused to allow Plaintiffs to file the Second Amended Complaint (doc. 27).  Thus, the single claim that remains is one against the City for alleged violation of Plaintiffs' right to equal protection.

The City filed the instant motion for summary judgment, requesting that this court find that it is entitled to judgment as a matter of law as to Count Three. After the Plaintiffs responded to the motion, the City filed a motion to strike certain facts and evidentiary submissions that Plaintiffs filed in connection with that response.

## II.  MOTION TO STRIKE

The City of Alabaster's motion requests that the court strike the following: Exhibit 1 -

2

specific statements in the affidavit of Kenneth Carter and certain exhibits attached to it; Exhibit 5 - the "Wellington Density;" Exhibit 6 - statements in the affidavit of James Cassidy; Exhibit 7 - statements in the affidavit of Tony Rivera; Exhibit 8 - statements in the affidavit of Laurie Sharp; Exhibit 10 - Tad Powell E-mail.  Plaintiffs did not respond to the motion.

Although acknowledging that some of the objections in the motion would be more appropriate to evidence presented for submission to a jury, the court is capable of making appropriate distinctions between evidence that meets the requirements of the federal rules of evidence  and the federal rules of civil procedure.  Therefore, the court DENIES the motion to strike.

### III.  MOTION FOR SUMMARY JUDGMENT

The City of Alabaster asserts that it is entitled to judgment as a matter of law on the one remaining claim for violation of Plaintiffs' equal protection rights.

### A.  FACTS

1.  Determination Regarding Undisputed Facts

In determining what facts are undisputed, the court notes that Plaintiffs have attempted to dispute several of Defendant's "Undisputed Facts."  However, Plaintiffs' attempt fails to comply with the court's directions in "Appendix II" on the court's website and its Orders repeatedly requiring dispositive motion submissions to comply with those directions.  *See* Order Setting Briefing Schedule (doc. 48) ("All submissions must comply with "Appendix II" available at the court's website. . . ."); Scheduling Order and Revised Scheduling Order (docs. 20 & 30) ("All potentially dispositive motions. . . must comply with this court's requirements as stated in "Appendix II" available on the court's website. . . ");  and Uniform Initial Order (doc. 4 ) (Any

motion(s) for summary judgment filed in the action *must comply* with *all* requirements of **Appendix II** . . . .).

Although the City's submission does not number the undisputed facts as required in Appendix II, it does list the facts in paragraphs and provide supporting citations to the record; therefore, the failure can easily be rectified simply by numbering paragraphs.  Plaintiffs dispute some of these facts by quoting the offending passages; however, they then fail to provide the *basis* for the dispute *or* the citations to the record proving the "fact" is untrue or disputed.  This disputation is a severe departure from the directions in Appendix II[2], which state:  "Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based.  *Any material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*"  (emphasis in Appendix II).

Without an explanation for the basis for the dispute or citations to the record, the court is unable to determine whether any evidentiary support exists for some of  Plaintiffs' objections.  As explained in Appendix II, "[w]hile the court reserves the right to consider evidentiary materials that are not specifically referenced in the brief, no party has a right to assume the court

---

[2] The court notes that the Appendix II directives are in accord with the current version of Rule 56(c)& (e) of the Federal Rules of Civil Procedure, providing in relevant part as follows:  "[Rule 56(c)](1) **Supporting Factual Position**:  A party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record. . . or (B) showing that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  (e) **Failing to Properly Support or Address a Fact.**  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ."

will consider such materials.  A specific reference must include the exhibit number, page, and when appropriate the line number."  The court has read the pages of the record that *the City* cited as support for the facts that Plaintiffs dispute.  The court finds that the record pages cited in paragraph 12, which Plaintiffs incorrectly labeled as paragraph 11, and the first two sentences in paragraph 41, do indeed support those facts in paragraphs 12 and 41.  However, the court agrees with Plaintiffs that the statements in paragraphs 1 (that no comparators to Plaintiffs' proposed developments exist), 40 (that the handling of Plaintiffs' applications was conducted in the normal course of the City's business), and  41 (that the Wellington Manor Apartment complex is not similarly situated to Plaintiffs' development) are conclusory statements that are determinations reserved for this court. As to all of the City's other Undisputed Facts, the court deems them to be true for the purposes of this motion, because of Plaintiffs' failure to refute them with evidence.

As to Plaintiffs' Additional Undisputed Facts, many of which the City's motion to strike addresses, the court does not strike those paragraphs, but has kept in mind the City's objections in determining which facts are truly undisputed.

### 2.   Recitation of Relevant Facts

Because the court's analysis of the motion for summary judgment focuses on the issue of whether another entity was similarly situated to Plaintiffs, this recitation of facts will highlight the facts relevant to that issue, and the court views those facts and all inferences drawn from them in the light most favorable to the Plaintiffs.

The remaining claim in this lawsuit, Count III, alleges that the City's actions involving Plaintiffs' property in the Peavine Creek Overlay District ("PCOD") and the proposed construction project on that property violated Plaintiffs' right to equal protection.  Because many

of the documents refer to this construction project, or a part of it, as "Weatherly Station," the court will also use that name.

On January 3, 2006, the City's Council adopted Ordinance 06-Z01, which amended zoning ordinance 99-101 and established the PCOD, the first overlay district of its kind in the City of Alabaster, and also established general requirements and procedures for development within the PCOD.  The Council stated the intent of the ordinance as: "to establish uses for this unique area that are compatible with the existing residential and industrial/commercial businesses there.  This area has a very busy traffic pattern complicated by a congested railroad track crossing, a two-lane county road [County Road 11] and an odd topography of the land."  Plaintiff Carter attended the Council meeting where that Ordinance was adopted and spoke in favor of establishing the PCOD.

On July 24, 2007, the owners of the property at issue in this lawsuit sold their interests to Plaintiff Maverick Enterprises, LLC.  Plaintiff Carter is Maverick's only member and the person who formed it and provided hundreds of thousands of dollars in his personal funds for the Weatherly Station project.   The property at issue, previously known as the R.H. Gentry Estate plat of 2003, was an unusual parcel of land.  Prior to the sale, it had been subdivided to form one small lot dominating the frontage of County Road 11 (Parcel 1) and a second, much larger flag lot behind the first (Parcel 2), with access to the public road thorough only a very small, narrow strip of land (the flag).  Prior to Maverick's purchase of the property, Plaintiff Carter, as representative of the property's then-owners, had filed an application for rezoning of the subject property.  The Ordinance establishing the PCOD also had rezoned Parcel 1 and the flag portion of Parcel 2 from residential to commercial (B-3) and the majority of Parcel 2, the rear portion to

6

the east of the flag, from an individual residential zone to R-6, a multi-family residential zone appropriate for apartments and condominiums.  That rezoning itself is not at issue in this suit.

However, the City's other actions regarding Plaintiffs' property in the PCOD are at issue. Plaintiffs' argument that the City treated its project differently than others similarly situated, attempting to delay or stop the project, requires a chronology of the City's actions regarding that project.  Although this opinion turns on the "similarly situated" element of Plaintiffs' *prima facie* case and a comparison between the Weatherly Station project and Plaintiffs' comparator, the project chronology will provide a background for what factors are necessary to that comparison.

The City zoning ordinance states in its general provisions that only one primary structure can exist per lot.  If an owner chooses to subdivide property, the City's subdivision regulations require that each lot have thirty feet of frontage on a public road.  Further, subdivision regulations provide as follows:  "If a development will exceed a total of 150 new residences, there shall be a primary and a secondary entrance.  All exceptions will have to be pre-approved by the planning commission."

On May 1, 2008, Plaintiffs filed an application for approval of a preliminary plat of its property in the PCOD.  This application proposed to divide Parcel 1, the front lot, into three separate lots for commercial development, and Parcel 2, the rear lot comprising approximately 38 acres, remaining as a single parcel with a multi-family residential complex of 276 units. Plaintiff's application for approval of a preliminary plat also provided for one road to access the rear property from County Road 11.  The survey of the property attached to this 2008 application was different from the survey connected with the 2003 R.H. Gentry Estate plat, and in this 2008 application all lots did not have thirty feet of frontage on the public road.

7

On May 5, 2008, Mike Ellis, the City Fire Official and Building Inspector, noted deficiencies of Plaintiffs' proposed preliminary plat, particularly related to the proposed single road providing access from the rear parcel to the public road.  In a letter dated May 15, 2008 to Plaintiff Carter, City Planner Harry Still informed Carter that, given the number of residential units that the plat proposed for the rear parcel, the regulations required both a primary and a secondary entrance and that any request for exemption must be in writing.

On May 16, 2008, the City received the City Engineer's preliminary review of Plaintiffs' May 1, 2008 preliminary plat application.  The review noted that, according to the map, Parcel 2 did not have proper frontage; that the City Fire Department would have to approve the preliminary plat; and that other deficiencies existed, including the lack of a secondary entrance.

On May 23, 2008, Plaintiff Carter submitted to the City's Planning and Zoning Commission a narrative description of the proposed preliminary plat as required for proposed developments within the PCOD.  After the City Planner reviewed the project, he noted in a memorandum dated May 27, 2008 that "if the residential units will exceed 150, a second entrance is required unless pre-approved by the Planning Commission. . . ."  The City Planner concluded in that memorandum that the preliminary plat should be approved, subject to the Subdivision Regulation requirement of both a primary and secondary entrance and architectural review of all structures on the site.

On May 27, 2008, the City Engineer in charge of reviewing Plaintiffs' proposal submitted a letter to the Zoning Coordinator, emphasizing the Subdivision Regulation requirement of both a primary and secondary entrance; the need for fire, sewer and fire department approval; the requirement of an accompanying narrative for projects in the PCOD; and the highway

department's control over the final design of the turn lane from the county road into the subdivision.

Also on May 27, 2008, the Planning and Zoning Commission held a meeting.  Prior to the meeting, Plaintiff Carter submitted a *new* preliminary plat application that reduced the number of lots on Parcel 1 from three to two.  This *new* application was apparently unaccompanied by a narrative.  At the Planning and Zoning Commission meeting, Carter withdrew Plaintiffs' entire preliminary plat application, which the minutes of the meeting refer to as incomplete, noting that any PCOD application must be accompanied by a narrative.  The minutes of the business meeting indicated that Plaintiffs' application was off the agenda and that Plaintiffs would have to re-apply.

At some point after Plaintiffs received Still's May 15 letter, Carter's attorney presented the 2003 R.H. Gentry Estate plat to Still, arguing that the existence of this plat rendered moot the secondary access entrance requirements in the City's subdivision regulations.  Still appeared to accept this argument.  He wrote Carter on June 17, 2008, advising him that because his submission for architectural review under the PCOD was not a preliminary plat, the *subdivision rules* requiring two entrances did not apply and that the way to proceed for approval would be to send a narrative, as required for PCOD developments, along with plans to the Planning Commission for approval.  However, Still's letter did not address the fire code requirements of access roads.  Also on June 17, the Zoning Coordinator sent a fax to the City Engineer echoing Still's analysis.

On July 2, 2008, Carter resubmitted Plaintiffs' application for the Weatherly Station project AR-0708-01 to the Planning Commission for architectural review, and this application

included a proposal for 276 residential units on the rear flag lot.

On July 9, 2008, the City Engineer wrote to the City Planner with a number of comments on Plaintiffs' Weatherly Station project, including the requirement that the plan receive Fire Department approval.

On July 22, 2008, the Weatherly Station project AR-0708-01 came before the Planning Commission for architectural review.  After a discussion of the 2003 International Fire Code's requirement that developments with this number of units have two fire apparatus roads, the City Attorney recommended that the Weatherly Station project matter be tabled until the Fire Chief approved the plan.  Accepting this recommendation, the Planning Commission tabled the project.

On August 11, 2008, the City's Fire Chief determined that International Fire Code provision D106.2, which required two fire apparatus access roads for a multi-family complex that has more than 200 units,  applied to the Weatherly Station project; thus, the Fire Chief determined that the  project must have two roads accessing the public road to comply with the fire code and to be approved.

That same day, the City's zoning coordinator sent a fax to the City Engineer, to Plaintiff Carter, and to Carter's attorney, advising them that Plaintiffs would not need to reapply but would need to furnish the Planning and Zoning department with revisions in light of the Fire Chief and fire official's reviews of the project.

On December 17, 2008, Carter filed a new application for architectural review on the Weatherly Station project: AR-09-01, attaching new plans.   The new plans, based on a survey that differed from the R.H. Gentry Estate plat, included two separate units for the Parcel 1 front commercial area and reduced the number of multi-family units in Parcel 2 from 276 to 198 units.

On January 9, 2009, Fire Official Mike Ellis prepared and submitted his official review of the Plaintiffs' new application, AR 01-09-01; he pointed out that because the new proposal was under 200 units, it was exempt from the 2003 International Fire Code's requirement of a second access road if all buildings would be equipped with approved automatic sprinkler systems.

On January 21, 2009, the City Engineer sent a report to the City Planner containing his observations after a review of the revised Weatherly Station project, including the requirement that the project receive approvals from the City's water, sewer, and fire departments, and the county highway department. On January 22, 2009, the Fire Chief submitted a Subdivision Review form for the revised Weatherly Station project, addressing the issues from his previous review and noting which issues still required attention.

On January 27, 2009, the Planning and Zoning Commission met.  Plaintiffs' application AR-0708-01 (with 276 units) was on the agenda, but Carter requested that he be allowed to withdraw it, and he did so.  Also on the agenda as a separate item was Plaintiffs' application AR-01-09-01 (with 198 units); the Commission discussed this matter and approved it for 198 units, noting that certain issues still to be resolved would be addressed during the building permit process.

On March 4, 2009, the senior clerk for the City's Department of Building Safety wrote to fellow building and zoning employees, copying the City's engineer, and noted deficiencies in Plaintiffs' building permit application and land use permit for the Weatherly Station project. On that same day, Carter submitted another set of plans and drawings for the proposed Weatherly Station development.  The Fire Official reviewed the Plaintiffs' new proposal, and the report of that review noted problems with the proposal: *Plaintiffs' failure to submit mechanical, electrical*

11

*or plumbing plans ("MEPs") required* for construction, and the lack of shop drawings for the required automatic sprinkler systems. Plaintiffs never submitted MEPs to the City on the Weatherly Station project.  The facts submitted do not reflect whether Plaintiffs provided shop drawings for the automatic sprinkler systems on that project.

On April 21, 2009, Carter withdrew Plaintiffs' building permit application submittal on the Weatherly Station project from the City and Carter confirmed the withdrawal in a letter dated April 30, 2009.  During the process of attempting to obtain approval for the construction of Weatherly Station project, Plaintiffs made no request for a variance or exception to City ordinances or regulations.  Plaintiffs filed the instant lawsuit on June 1, 2009.

*Comparator*

Since the PCOD's adoption in 2006, no apartment developments have existed in the PCOD, and no apartment or multi-family development proposals for the PCOD have been presented for City approval other than Plaintiffs' Weatherly Station project.

Plaintiffs point to a project called Wellington Manor Apartments outside the PCOD as their only comparator.  Wellington Manor is the only apartment project in the City containing more than 200 dwelling units.  This project is physically located .5 miles from the Weatherly Station project and has only one road for ingress and egress on the property.  Because Wellington Manor is not located within the PCOD, it did not have to go through an architectural review process with the Planning and Zoning Commission as required for all proposed projects within the PCOD, including Weatherly Station.  Further, Wellington Manor is not located on property with a utility right of way or railroad easement that forms a boundary to the property.  The Wellington Manor project was first developed in the 1990s, *prior to* the City's adoption of the

International Fire Code, and Phase 1 of that project involved the construction of buildings with a combined total of 248 dwelling units.

The developer for the Wellington Manor project requested a variance from the City in 2002 to build four additional apartment structures, presumably because the total number of residential units in the complex with the additional units would be above the density requirements for property of that size.  The City granted that variance in early 2003, again *before* the adoption of the International Fire Code.  However, the variance did not exempt the project from the City's zoning ordinances.

On May 17, 2003, shortly before the International Fire Code was adopted in August of 2003, the Wellington Manor developer submitted to the City construction drawings for those four structures with a total of 64 additional residential units.   The City issued building permits for three of the four additional buildings in October of 2003 and for the final apartment building in June of 2004.  With two exceptions, the City issued Wellington Manor's building permits on the same day as the building permit application.  However, the developer of Wellington Manor had submitted all required plans and specifications, including MEPs, to the City *before* the City issued building permits.

The four Wellington Manor structures constructed after the adoption of the 2003 International Fire Code are located close enough to a public road so that City fire trucks can pull fire hoses to all four structures from the public road.  Three out of the four Wellington Manor structures are less than twenty-five yards off the public road, and the inhabitants of those structures have immediate access to the public road.  In contrast, all of the proposed Weatherly Station structures are located about one-half mile away from the nearest public road, and the

access to that public road from all structures is through the same private road running through the same narrow strip of land.

### B.  STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not

14

significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."). "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings." *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324). If, he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.*

15

*State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Id.*  The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

### C.  DISCUSSION

The City of Alabaster presents this motion for summary judgment on the only count remaining in this suit, Count Three, alleging that the City of Alabaster violated Plaintiffs' constitutional right of equal protection.  In 2000, the Supreme Court recognized the viability of "a class of one claim ... where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)).  In other words, the Court recognized "that equal protection claims were cognizable apart from class-based discrimination."  *Griffin Inds. v. Irvin*, 496 F.3d 1189, 1202 (11th Cir. 2007).  "Plaintiffs must show (1) that they were treated differently from other similarly situated individuals, and (2) that Defendant unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiffs." *Young Apartments, Inc. v. Jupiter*, 529 F.3d 1027 (11th Cir. 2008) . The Eleventh Circuit has emphasized that "different treatment of dissimilarly situated persons does not violate the equal protection clause."  *Campbell*, 434 F.3d at 1314 (quoting *E & T Realty v.*

16

*Strickland*, 8u30 F.2d 1107, 1109 (11th Cir. 1987).   The issue in the instant case is whether Plaintiffs have established an element of  their *prima facie* case: that Wellington Manor, the only entity they present as a comparator, is "similarly situated."

Plaintiffs claim that the City of Alabaster treated their Weatherly Station project differently than the comparator project, Wellington Manor.  They argue that Wellington Manor is also an apartment/condominium project of over 200 residential units with one access road; however, the City quickly granted the building permits for Wellington Manor buildings and did not apply the fire code to require two separate access roads from the public road for fire safety or force a reduction in the number of apartment units.  Further, they argue that the City misinterpreted the code's requirement regarding fire apparatus roads and that even though the Weatherly Station project only had one private access road leading to the public road, it satisfied this requirement by providing access around each building for fire trucks to reach them. Finally, they argue that their failure to submit MEPs should not have held up the Master building permit in a "design and build" project such as Weatherly Station, but rather, MEPs were not traditionally due until a later stage when they applied for building permits for each individual building.

Rather than addressing all of Plaintiffs' arguments, the court will first focus upon whether Wellington Manor is similarly situated to Weatherly Station in the equal protection context. When addressing whether two development projects are similarly situated in the equal protection "class of one" context, the Eleventh Circuit has required the plaintiff to establish the similarity of those projects with some "specificity." *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006), *cert. denied,* 549 U.S. 1020 (2006).  The Court of Appeals explained that for one development to be similarly situated to the plaintiff's, "it must be *prima facie* identical in all

relevant respects." *Id.*   It must be "essentially the same size, have an equivalent impact on the community, . . .require the same zoning variances . . . [and] would need to be subject to the same governmental decisionmaking process. . . ." *Griffin Inds., Inc.*, 496 F.3d at 1204.  "The burden of identifying similarly situated individuals [or entities] is a heavy one." *Hicks v. Jackson County Comm'n*, 374 F. Supp. 2d 1084, 1096 (N.D. Ala. 2005).

The City argues that Wellington Manor cannot be similarly situated to Weatherly Station, because Wellington Manor is not located in the PCOD and because the PCOD, the first overlay district of its kind in the City of Alabaster, is such a unique area that only proposed projects in the PCOD would be similarly situated to Weatherly Station.  Indeed, Weatherly Station is the only *multi-family* residential project that has ever been proposed in the PCOD, and if the City's argument is correct, then Plaintiffs could not establish the "similarly situated" element of their *prima facie* case.  Without more extensive information about land within the City, the court is not prepared to accept this argument and automatically limit the geography of similarly situated entities to those in the PCOD.  While the PCOD is the first overlay district in the City and does include geographical/topographical challenges that affect the issues presented, other areas of land within the City could potentially include similar challenges for construction projects (i.e., the project's similar lengthy distance from public roads; similar narrow strip of land for accessing the public roads; similar areas of land subject to architectural review for construction projects, etc.).  However, given the special character of the PCOD, the court acknowledges that Plaintiffs have a particularly difficult task of proving that the Wellington Manor project, which is the only comparator presented and is outside the PCOD, is *prima facie* identical in all relevant respects.

The court finds that Plaintiffs in the instant case do not meet this high burden.  The

18

Wellington Manor project does have *some* similar elements: it is a multi-family residential project containing over 200 units with one access road and is *near* to the proposed Weatherly Station site. However, it differs from the Weatherly Station project in many relevant respects.  Wellington Manor is  not located in an overlay district and was not subject to the same requirements of architectural review.   Wellington Manor was subject to subdivision requirements that the City ultimately decided did not apply to Weatherly Station.

Further, and very significantly, the Wellington Manor project site did not have challenges with geography/ topography that were similar to those of Weatherly Station's site.  The shape of Weatherly Station's site is peculiar: it has a long, narrow strip of land leading from the proposed multi-family building site to the only public road access approximately half a mile away, and a railroad track forms the northern boundary of the property, presenting a barrier for ingress/egress along that boundary.  The peculiar shape of the Weatherly Station site is relevant when comparing projects because that shape and the limited public road access raised safety concerns, particularly with fire apparatus access and fire code requirements.

The evidence presented does not indicate that the Wellington Manor site involved a peculiar shape or other factors that presented public road access problems and fire code compliance problems.  Indeed, many of the buildings in the Wellington Manor project were not even subject to the same fire code requirements as Weatherly Station, which was subject to the 2003 International Fire Code. All but four buildings of the Wellington Manor project were built *before* the 2003 adoption of the International Fire Code.  Because the code's fire apparatus access requirements are at issue, the units of the Wellington Manor phase built before the adoption of the code would not be similarly situated.  The court notes that even the additional four buildings had

19

received some level of pre-code approval.  In any event, the site of those four post-code buildings

does not have the same public road access challenges as Weatherly Station.  In contrast to

Weatherly Station, three of the four post-code Wellington Manor buildings are within twenty five

yards of a public road, providing residents immediate public road access.  All four Wellington

Manor structures are located close enough to a public road so that City fire trucks can pull fire

hoses to all four structures from the public road.  Given the issues presented regarding fire

apparatus access and the delay those issues caused in approving the Weatherly Station project, the

differences in geography and public road access are relevant and prevent a finding that the

comparator was similarly situated.

In sum, Plaintiffs present no genuine issue of material fact concerning the existence of a

similarly situated comparator.  Without a similarly situated comparator, Plaintiffs cannot say they

are treated differently and cannot meet their *prima facie* case for a violation of the equal

protection clause.

Plaintiffs and the City raise other issues in their briefings on the motion for summary

judgment.   For example, the City contests the standing of Plaintiff Carter to bring this suit despite

his status as the only member of Maverick and his spending of personal funds on the Weatherly

Station project.  As another example, Plaintiffs argue that the City treated them unfairly by failing

to issue building permits on the Weatherly Station site until they provided MEPs, but assert that

MEPs were not required at this stage for projects constructed under the "design and build"

method.  Plaintiffs have presented no evidence regarding whether Wellington Manor was

constructed under the "design and build" method.  In any event, the evidence shows that the

Wellington Manor developer submitted MEPs prior to the City's issuance of building permits but

20

that Plaintiffs never submitted MEPs on the Weatherly Station project.  Thus, Plaintiffs have not established unequal treatment on the two projects as to the MEP issue.

However, given its determination that the Wellington Manor project, the only comparator offered by Plaintiffs, does not meet the "similarly situated" element of Plaintiffs' *prima facie* case, the court need not address those and other issues.  Therefore, the court finds that the City is entitled to summary judgment on the equal protection claim asserted in Count III, the only remaining claim in the only remaining count.

Dated this 14th day of January, 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE